UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

| | |
|---|---|
| SHENIECE CLARK, | 12 Civ. 9372 (KMK) (LMS) |
| Plaintiff, | |
| v. | **STATEMENT OF MATERIAL UNDISPUTED FACTS PURSUANT TO LOCAL CIVIL RULE 56.1** |
| JEWISH CHILD CARE ASSOCIATION, INC., | |
| Defendant. | |

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - X

Pursuant to Rule 56.1 of the Local Civil Rules of the United States District Court for the Southern District of New York, Defendant Jewish Child Care Association, Inc. (hereinafter "JCCA"), by its attorneys, Proskauer Rose LLP, hereby submits the following Statement of Material Undisputed Facts Pursuant to Local Civil Rule 56.1 in support of its Motion for Summary Judgment as to claims asserted by Plaintiff Sheniece Clark ("Clark").

**JCCA's Operations**

1.  JCCA is a not-for-profit organization providing a full range of social and residential services to children and their families in the New York metropolitan area. (Declaration of Steven Mayo ("Mayo Decl.") ¶ 2.)

2.  JCCA's residential treatment center in Pleasantville, New York – the Pleasantville Cottage School (although it is not a school) ("PCS") – serves children at risk to themselves or others, who cannot live at home. (Mayo Decl. ¶ 3.)

3.  The New York State Office of Children and Family Services ("OCFS") is a government agency that, among other things, oversees and regulates child services programs like

PCS, including investigations of complaints of child abuse and maltreatment.  (Mayo Decl. ¶ 5; Sheniece Clark Deposition Transcript ("Clark Tr.", attached as Exhibit A to the Declaration of Andrew E. Rice, Esq. ("Rice Decl.")) 120:3-19.)

**Clark's Employment with JCCA**

4. Clark began working for JCCA in or around April 2003 as an on-call switchboard operator.  (Complaint for Employment Discrimination ("Compl.") (Rice Decl. Ex. B) ¶ E.1.; Clark Tr. 14:9-11, 63:8-14.)

5. Clark began working as a full-time milieu counselor (child care employee) for JCCA in April 2006.  (Clark Tr. 63:15-21, 64:10-24; Mayo Decl. ¶ 4.)

6. As a milieu counselor, Clark worked in the residential cottages at PCS and was responsible for the everyday needs and activities of the residents, including, among other things, safety, supervision and accountability of residents, upkeep of the cottage, escorting residents to appointments, and ensuring that residents were doing what they needed to do.  (Clark Tr. 79:4-19, 80:14-82:20; JCCA Milieu Counselor Job Description (Rice Decl. Ex. E); Mayo Decl. ¶ 4.)

7. Clark admitted that she was able to do all of the job duties in the JCCA Milieu Counselor Job Description, except:  (i) she attended briefings and treatment conference meetings only as assigned by the supervisor of the Cottage (rather than all such briefings or meetings); (ii) she and the other milieu counselors did not do the residents' hair; and (iii) she only took residents out with permission from the supervisor and consent from the residents' legal guardians.  (Clark Tr. 82:21-83:9.)

8. The residents for whom Clark was responsible as a milieu counselor were adolescent females.  (Clark Tr. 79:23-80:13.)

9. Clark worked in several different PCS cottages over the course of her employment as a milieu counselor at JCCA.  (Clark Tr. 71:13-15, 73:7-10, 73:22-74:11, 76:2-77:9, 77:24-78:13.)

10. Clark alleges that she was a "target" in Cottage 16 because the residents in that unit did not like her because of her "structured style of work," and that JCCA set her up to be in that position, in September 2010.  (Clark Tr. 85:14-86:8.)

**Clark's Shoulder Injury and Leaves of Absence**

11. Clark went on leave on two occasions while employed at JCCA.  (Clark Tr. 95:21-23, 99:23-100:4.)

12. Clark took a workers' compensation disability leave from May 3, 2008 through August 2008 due to a torn ligament in her right shoulder.  (Compl. ¶ E.2.; Clark Tr. 96:9-97:3.)

13. According to Clark, she first became disabled when she injured her right shoulder on May 3, 2008.  (Clark Tr. 101:2-12.)

14. Clark treated with Dr. Faierman concerning her May 2008 shoulder injury about every six weeks thereafter.  (Clark. Tr. 193:10-21.)

15. Clark was experiencing increased right shoulder and neck pain for several months prior to March 30, 2011, when she reinjured her right shoulder.  (Clark Tr. 194:3-17, 195:7-10.)

16. Clark went on leave again after March 30, 2011 when she reinjured her right shoulder, and was returned to work at the end of the leave, on August 9, 2011.  (Clark Tr. 49:20-23, 60:19-20, 77:16-18, 97:14-98:20.)

17. When Clark returned to work in August 2011, it was because she "felt okay," and it was not against her doctor's recommendation or wishes.  (Clark Tr. 110:16-111:2.)

18. Clark's doctor did not place any restrictions on her when she returned to work in August 2011. (Clark Tr. 205:5-8.)

**Clark's Alleged Requests for Accommodation**

19. In her responses to JCCA's interrogatories, Clark identified two alleged requests for accommodation that she made in 2008 and stated that in 2010 she reported concerns about unsafe working conditions. Clark did not identify any other accommodation requests. (Plaintiff's Objections and Responses to Defendant's Interrogatories (Rice Decl. Ex. L), Answer No. 12.)

20. Clark testified that she sought, as an accommodation for her alleged disability, "[a] change in [her] schedule due to going to physical therapy, numerous time, [she] asked to have [her] schedule change due to the safety of being in certain cottages that [her] supervisors had placed [her] in which was dangerous situations due to her . . . work-related injury . . . ." (Clark Tr. 39:23-40:5.)

21. Clark further testified that she sought a transfer back to the switchboard as an accommodation, starting in 2008 and again in 2010 and in 2011 before she went back out on leave after re-injuring her shoulder. (Clark Tr. 42:3-16.)

22. Clark admitted that she does not have any documents reflecting her alleged request to return to the switchboard. (Clark Tr. 42:17-19.)

23. Clark requested a transfer out of Cottage 16 in or around early 2011, before her leave, and the request was granted that same day with assistance from JCCA Senior Human Resources Associate Michelle Borges. (Clark Tr. 76:2-77:15, 90:23-91:2; Mayo Decl. ¶ 7.)

24. Clark believes that JCCA's denial of requested accommodations was discriminatory because of her history of challenging her supervisors. (Clark Tr. 112:16-21.)

25. Clark testified that JCCA accommodated several other employees with alleged disabilities in various ways. (Clark Tr. 112:22-114:2.)

26. Clark did not request any accommodation upon her return to work in August 2011. (Clark Tr. 205:5-17.)

**Clark's Termination and Preceding Events**

27. In 2009, OCFS indicated Clark in a report of abuse and neglect concerning an incident in late April 2009 involving a resident in her care. (Clark Tr. 120:20-121:9.)

28. OCFS interviewed Clark in connection with the April 2009 incident. (Clark Tr. 128:5-7.)

29. OCFS concluded that Clark had abused the resident in her care. (Clark Tr. 128:16-19.)

30. JCCA placed a disciplinary notice in Clark's personnel file concerning the 2009 OCFS indication stating that it was "a final warning and in the event that another incident of a similar nature occurs, [her] employment will be terminated." (Clark Tr. 135:25-136:19; 9/29/09 Disciplinary Action Memorandum (Rice Decl. Ex. F).)

31. In March 2010, OCFS upheld its 2009 indication against Clark after an Administrative Review, determining that there was a "fair preponderance of evidence to Retain the report." (Clark Tr. 149:9-150:6; 3/29/2010 Letter from OCFS (Rice Decl. Ex. G).)

32. OCFS indicated Clark for abuse of a resident again in 2011, concerning an incident on March 14, 2011. (Clark Tr. 150:7-12.)

33. Clark did not fill out a critical incident report concerning the March 14, 2011 incident despite the fact that it was her responsibility to document any such incident. (Clark Tr. 156:21-23, 157:12-15, 221:20-222:18.)

34. According to Clark, Ms. Evensen (a JCCA social worker) and Ms. Fazio (JCCA Director of Campus Life) reported the March 14, 2011 incident to OCFS after the resident-victim reported the incident to Ms. Evensen on June 1, 2011.  (Clark Tr. 159:25-161:3.)

35. Clark admitted that upon learning of the incident, Ms. Evensen was mandated to report the incident to OCFS.  (Clark Tr. 161:4-8.)

36. JCCA terminated Clark's employment on August 11, 2011.  (Clark Tr. 208:10-15.)

37. Clark had already returned from her leave when she was notified of her termination.  (Clark Tr. 252:6-9.)

38. At the time of Clark's termination, there were two OCFS indications against her.  (Clark Tr. 46:22-25.)

39. JCCA notified Clark that she was terminated because of the second OCFS indication against her.  (Compl. ¶ E.5; Clark Tr. 209:20-210:9, 216:11-19; 8/12/11 Letter from Kay Turner to Sheniece Clark (Rice Decl. Ex. J).)

40. Several JCCA documents reflect that Clark was terminated from employment because of the OCFS findings against her.  (Clark Tr. 207:11-23, 208:16-18, 208:24-209:19; Notice of Termination of Employment (Rice Decl. Ex. H); 8/11/11 E-Mail from Michelle Borges to Pauline Sukhan (Rice Decl. Ex. I).)

41. JCCA never told Clark that there was any reason for her termination other than the OCFS findings.  (Clark Tr. 210:10-13, 216:11-19.)

**Clark's Challenge to the OCFS Findings**

42. After her termination, Clark requested that OCFS expunge the indications against her.  (Clark Tr. 253:6-9.)

43. A hearing was scheduled by OCFS for January 6, 2012, but the hearing was never held. (Clark Tr. 260:13-22.)

44. The OCFS Administrative Law Judge found that OCFS did not meet its burden to prove that Clark committed the alleged acts of neglect because OCFS counsel, prior to the hearing, informed the judge that OCFS would not present any evidence at the hearing. (Clark Tr. 261:19-263:8; OCFS Decision After Hearing (Rice Decl. Ex. K).)

45. Clark does not know why OCFS chose not to present evidence at the hearing. (Clark Tr. 263:16-18.)

**Clark's Complaint to the New York State Division of Human Rights**

46. Clark filed a complaint with the New York State Division of Human Rights ("NYSDHR") on November 22, 2011. (Clark NYSDHR Complaint (Rice Decl. Ex. C); Clark Tr. 33:19-35:23.)

47. Clark's complaint to the NYSDHR was the only complaint or charge that she ever filed with any agency in connection with her employment at JCCA. (Clark Tr. 50:24-51:7.)

48. The NYSDHR dismissed Clark's complaint, finding that "[t]he evidence gathered during the course of the investigation [was] not sufficient to support that Complainant was discriminated against by Respondent [JCCA] based on her disability (Shoulder injury) and/or retaliation." (NYSDHR Determination and Order After Investigation (Rice Decl. Ex. D).)

49. The NYSDHR also concluded that Clark "was terminated as a result of having two (2) child abuse investigations against her." (*Id.*)

50. Clark's NYSDHR complaint was cross-filed with the U.S. Equal Employment Opportunity Commission, which adopted the NYSDHR's findings and issued Clark a dismissal and notice of right to sue in September 2012. (Clark Tr. 62:9-15.)

**Clark's Complaint for Employment Discrimination in this Action**

51.     The sole statute under which Clark asserts claims in this action is the Americans with Disabilities Act ("ADA").  (Compl. at 1; Clark Tr. 250:19-25.)

52.     Clark alleges that the only discriminatory conduct about which she complains includes the termination of her employment, failure to accommodate her disability, and retaliation.  (Compl. ¶ II.A; Clark Tr. 251:2-12.)

53.     Clark alleges that her disability is a "work-related shoulder injury."  (Compl. ¶ II.D.)

54.     Clark's Complaint for Employment Discrimination in this action does not allege retaliation on the basis of a separate complaint filed by Clark's family member against JCCA.  (Compl. § II.E.)

**Clark's Discrimination Allegations**

55.     Clark alleges that the only reason that her termination was discriminatory was because JCCA notified OCFS of the allegation against her while she was out on disability leave and did not notify her at the time.  (Clark Tr. 215:17-216:10.)

**Clark's Retaliation Allegations**

56.     Clark never complained about discrimination to anyone at JCCA.  (Clark Tr. 248:8-10.)

57.     According to Clark, the first instance of retaliation against her by JCCA occurred in June 2011, when JCCA reported an incident involving Clark to OCFS.  (Clark Tr. 114:6-17.)

58.     Clark alleged at her deposition that JCCA retaliated against her because a family member had filed a complaint against JCCA.  (Clark Tr. 39:3-6.)

59. Clark's sister, Cedeka Gooden, filed a complaint with the New York City Commission on Human Rights and the U.S. Equal Employment Opportunity Commission against JCCA in June 2010, asserting sex discrimination and retaliation claims under Title VII of the Civil Rights Act and the New York City Human Rights Law, but no claims under the ADA. (Mayo Decl. ¶ 6.)

60. Clark also alleges that JCCA retaliated against her because she was "an outspoken employee and always challenging [her] . . . supervisors . . . ." (Clark Tr. 39:7-10.)

61. Clark feels that JCCA retaliated against her because she "challenged [her] supervisors on every issue and they did not like [her]." (Clark Tr. 145:18-21.)

62. Clark alleges that her termination was retaliation for taking a second disability leave and for fighting to be removed from Cottage 16 due to safety reasons. (Clark Tr. 217:10-17.)

Dated:    New York, New York
          August 8, 2014

Respectfully submitted,

PROSKAUER ROSE LLP

By: _____
Jerold D. Jacobson
Andrew E. Rice
PROSKAUER ROSE LLP
11 Times Square
New York, NY  10036-8299
Phone: (212) 969-3000
Email: jjacobson@proskauer.com
       arice@proskauer.com
*Attorneys for Defendant*